**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| JAMES E. SPARENBERG | * | |
| | * | |
| v. | * | Civil No. JFM-14-1667 |
| | * | |
| EAGLE ALLIANCE d/b/a Computer Science | * | |
| Corporation | * | |
| | ****** | |

## MEMORANDUM

Plaintiff James E. Sparenberg ("Sparenberg") brings suit against defendant Eagle

Alliance for violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*,

the Americans with Disabilities Act as amended ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C, § 621 *et seq.*  Now pending is

Eagle Alliance's motion for summary judgment.  The parties have fully briefed the motion, and

no oral argument is necessary.  *See* Local Rule 105.6.  For the reasons below, the motion is

granted in part and denied in part.

## BACKGROUND

Sparenberg, a 70 year-old male, is currently employed by Eagle Alliance as a System

Administrator.  (ECF No. 8, ¶ 1).  Eagle Alliance is a division of Computer Science

Corporation—a large contractor specializing in information technology ("IT") services—whose

clients include the National Security Agency ("NSA").  (ECF No. 36, p. 3, ¶ 1).  Sparenberg has

worked at Eagle Alliance since October 2001 in an IT support role where he is paid hourly.

(ECF No. 36, Ex. B, 113:10–12).  In June 2004, Eagle Alliance promoted Sparenberg and

assigned him as one of three Senior Administrator Officers ("SAO") at the NSA's National

Security Operations Center ("NSOC") in Fort Meade, Maryland.  (ECF No. 8 at ¶¶ 16, 19).

NSOC is a 24-hour facility, which provides time-sensitive signals intelligence reporting ("SIGINT") for the United States government's SIGINT system.  (ECF No. 36, p. 2, Ex. A, ¶¶ 11–12).  As part of Eagle Alliance's contract with NSOC, Eagle Alliance provides technical support to NSOC for twenty hours a day, five days a week.  *Id.* at ¶ 13.  According to Eagle Alliance, it would assign one employee per eight-hour shift at NSOC, and the employee would rarely have backup.  *Id.* at ¶ 15; (ECF No. 8, ¶ 19).  Sparenberg's job at NSOC focused on tending to the technical needs of NSOC employees: an employee would report a computer problem and Sparenberg would try to resolve the problem.  (*See generally* ECF No. 39, Ex. 3, 72:4–78:4).  Beyond his customer service responsibilities, Sparenberg also replaced computers, and created and maintained usernames.  (ECF No. 36, Ex. C, 22:18–21).  Due to NSOC's "mission-critical" work, once Sparenberg began working at NSOC, Sparenberg became entitled to a "pay uplift" of $1,138 a month.  (ECF No. 36, p. 6, ¶ 18).

In January 2011, Sparenberg's wife had surgery for kidney cancer and was hospitalized for ten days.  (ECF No. 8, p. 2).  Sparenberg applied for FMLA leave to care for her.  (ECF No. 36, p. 4, ¶ 9).  Eagle Alliance granted the FMLA request and Sparenberg took leave between January 14, 2011 and February 9, 2011.  *Id.*  In December 2011, Sparenberg's wife was hospitalized for a second time.  (ECF No. 8, p. 2–3).  Sparenberg requested leave from Eagle Alliance to care for her.  Again, Eagle Alliance granted the FMLA request and Sparenberg took leave from December 12, 2011 to January 17, 2012.  (ECF No. 36, pp. 4–5, ¶ 10).  In both instances, it is undisputed that both Sparenberg and Eagle Alliance properly followed FMLA procedures in the granting and taking of leave.

Shortly before Sparenberg's second FMLA leave began, an NSOC employee emailed Eagle Alliance's Client Service department to express interest in replacing Sparenberg at

NSOC.[1]  The NSOC employee noted Sparenberg was "sick quite often or has to take off for his wife's illness."  (ECF No. 39, Ex. 9, p. 45).  The NSOC employee also articulated concern about Sparenberg's technical skills stating, "while [Sparenberg] is excellent at Customer Service his technical skills are not."  *Id.*  The employee made clear the email was an informal request so as not to "break any policies."  *Id.*  In response to the email, an Eagle Alliance Client Service Manager said she had "not been involved in such a 'concern' before," and was unsure of the correct course of action.  *Id.* at 44.

After the informal request to the Client Service department, NSOC also made a request to Eagle Alliance's Program Management Office.  (ECF No. 39, Ex. 7, 75:14–17).  The issue percolated between NSOC and Eagle Alliance until the subject of Sparenberg's removal arose again in an email drafted by Paul Aldridge, an Eagle Alliance Project Manager, entitled, "Jim Sparenberg Situation and Some Background."  (ECF No. 39, Ex. 9, p. 42).  In the email, Aldridge informed his colleague that NSOC wanted Sparenberg's replacement by May 21, 2012.  Aldridge stated Sparenberg "has missed a lot of work with his wife and his health problems."  *Id.*  Aldridge revealed a reluctance to accede to NSOC's demands, saying, NSOC "shouldn't tell us how to run [Eagle Alliance] personnel, but the award fee is coming up."[2]  *Id.*  In another email, Wendy Callis, Sparenberg's second-level supervisor at Eagle Alliance, acknowledged Eagle Alliance's Human Resources ("HR") department had told her earlier that, "we could not move [Sparenberg] from that area."  (ECF No. 39, Ex. 9, p. 38).

Eventually, the issue was elevated to June Hoehl, Sparenberg's third-level supervisor at Eagle Alliance, and Mike Haley, Eagle Alliance's vice president.  (ECF No. 39, Ex. 7, 87:12–

---

[1] The name of the NSOC employee and their title have been redacted from the record.
[2] The award fee is a bonus Eagle Alliance received from clients potentially amounting to millions of dollars.  The award fee was dependent on the amount of work Eagle Alliance performed and client satisfaction.  (*See* ECF No. 39, Ex. 7, 87:22 – 89:6).

19).  In an email to Hoehl on May 11, 2012, Charles Emory, an Eagle Alliance Program

Director, emphasized the need for a replacement, noting that Sparenberg's "absence[s] and

spotty reliability have been an issue with the NSOC for quite a while."  (ECF No. 39, Ex. 9, p.

39).  Hoehl responded that he had been working through FMLA issues with Eagle Alliance's HR

department but come to a resolution.  *Id.*  Eagle Alliance also admits Haley told Hoehl that

Sparenberg's removal "had the potential to become an award-fee issue."  (ECF No. 39, Ex. 7,

87:20–88:1).

  In the midst of the transfer process, Sparenberg alleges that his Eagle Alliance supervisor

Bruce Frederick told him that, "NSOC does not want you because you are taking too much of

sick leave."  (ECF No. 39, Ex. 1, p. 3).  Sparenberg also alleges that his NSOC supervisor

Jennifer Blake said he was being transferred on account of taking too much time off.  (ECF No.

39, Ex. 3, 40:2–14).

  On April 21, 2012, Eagle Alliance transferred Sparenberg from NSOC to a Special

Projects assignment at NSA in Fort Meade, where he remains.  At the time of his removal from

NSOC, Eagle Alliance paid Sparenberg approximately $35/hour.  (ECF No. 39, Ex. 3, 116:5–

16).  Frederick told Sparenberg his replacement at NSOC was Chris Roberts, a 27 year-old male.

*Id.* at 35:7–13; (*see also* ECF No. 39, p. 6, ¶ 22).  No longer at the "mission-critical" NSOC,

Sparenberg alleges his assignment to Special Projects functioned, in effect, as a demotion.  (ECF

No. 8, p. 3).  In Sparenberg's telling, his role changed from troubleshooting technical problems

to being "just a computer mover."  (ECF No. 39, Ex. 3, 28:5–14).  Despite the alleged decrease

in responsibility, Sparenberg received a nominal increase in hourly pay until Eagle Alliance

froze his hourly pay along with the rest of its employees.[3]  (*See* ECF No. 39, Ex. 3, 115:7–

117:6).  Curiously, for more than a year after being transferred, Sparenberg also continued to

receive the NSOC pay uplift even though he no longer worked there.  Although there is some

dispute as to why Sparenberg continued to receive a pay uplift, Eagle Alliance now admits the

payments were in error.  (ECF No. 39, Ex. 7, 98:18–99:5).  After discovering the mistake in June

2013, Eagle Alliance ceased the pay uplift to Sparenberg on June 22, 2013.  (ECF No. 36, p. 4,

Ex. A, ¶ 32).

From November 27, 2013 to December 17, 2013, Sparenberg took approved FMLA leave

for a third time—this time for jaundice and gall bladder surgery.  (ECF No. 36, p. 5, ¶ 11).  In

May 2014, his new Eagle Alliance supervisor at Special Projects gave him an overall

performance evaluation of "does not meet expectations."[4]  (ECF No. 39, Ex. 6, p. 14, No. 19).

Eagle Alliance submits that Sparenberg's negative performance evaluation was due, in part, to

his failure to inform his manager of his intention to take FMLA leave.  (ECF No. 36, p. 7, ¶ 29).

For his part, Sparenberg claims he gave Eagle Alliance notice and Eagle Alliance failed to pass

the notice along to his manager.  (*See* ECF No. 39, p. 24).  In a subsequent interim evaluation in

December 2014, Eagle Alliance noted Sparenberg's performance had improved.  *Id.*

---

[3] Sparenberg admits Eagle Alliance instituted a pay freeze from 2012 to present.  (ECF No. 36, Ex. B, 117:8–119:7).  He also acknowledges that Eagle Alliance did not make a written promise to increase his yearly wages.  *Id.*

[4] In his other reviews while at NSOC, Eagle Alliance gave Sparenberg a rating of "Meets/Occasionally Exceeds Expectations."  (*See, e.g.*, ECF No. 36, Ex. B, pp. 86–101).  In Sparenberg's 2008 review, four years before Eagle Alliance transferred him, Eagle Alliance rated Sparenberg as meeting or exceeding expectations in a number of target areas and described Sparenberg as "a sound technician who provided strong support to the NSOC customer . . . ."  *See id.* at pp. 91–96.  Sparenberg's evaluator also stated, he "has occasionally missed the objective for the number of completed tickets" and "better dedication to work habits would result in increased productivity."  *Id.*  In 2011, shortly before Sparenberg's transfer, one of Sparenberg's supervisors commended Sparenberg's work, saying, "[Sparenberg's] technical knowledge and customer service skills have directly contributed to the successful efforts that this team has accomplished throughout this past year."  (ECF No. 36, Ex. 12, p. 5).

Sparenberg filed a discrimination claim with the Equal Employment Opportunity

Commission ("EEOC") on April 21, 2014.  On May 30, 2014, the EEOC issued a Right to Sue

letter.  (ECF No. 8, ¶ 12).  Sparenberg filed the instant complaint on May 22, 2014, and amended

the complaint on July 1, 2014.  (*See* ECF Nos. 1, 8).  The parties concluded discovery and Eagle

Alliance filed a motion for summary judgment on July 2, 2015.  (ECF No. 36).

## STANDARD

Under Fed. R. Civ. P. 56(c), a court grants summary judgment "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  *See also Anderson v. Liberty Lobby Inc.,* 477 U.S. 242,

247 (1986).  A genuine issue of material fact exists where, "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Id.*  The substantive law

governing the claim determines which facts are material.  *Id.* at 248.  When reviewing a motion

for summary judgment, the court must look at facts and inferences in the light most favorable to

the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  The party seeking summary

judgment bears the initial burden of demonstrating the absence of a genuine dispute of material

fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Trial courts have an obligation to prevent "factually unsupported claims and defenses

from proceeding to trial."  *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)

(citing *Celotex*, 477 U.S. at 323–24).  In response to a properly supported motion for summary

judgment, the non-moving party must establish a genuine issue of material fact.  *Anderson*, 477

U.S. at 248–49; *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970).  A court should

also enter summary judgment when a party fails to make a showing sufficient to establish

elements essential to a party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp.*, 477 U.S. at 322.

## ANALYSIS

### I.      FMLA Claims

The FMLA allows an eligible employee to take leave to care for his or his spouse's

"serious health condition."  29 U.S.C. § 2612.  Sparenberg asserts two claims against Eagle

Alliance under the FMLA—one for interference (Count I) and one for retaliation (Count II).  As

a preliminary matter, Eagle Alliance argues that Sparenberg's FMLA claims fall outside the

statute of limitations.  Generally, a plaintiff must bring a FMLA claim within two years "after the

date of the last event constituting the alleged violation."  29 U.S.C. § 2617(c)(1).  For both his

interference and retaliation claims, Sparenberg alleges that his April 2012 transfer from NSOC to

a Special Projects location and his June 2013 reduction in salary constituted an FMLA

violation.[5]  The reduction of salary, *i.e.*, the "last event constituting the alleged violation,"

occurred within two years of Sparenberg filing his complaint.[6]  Thus, Sparenberg's FMLA

claims are not barred by the FMLA's statute of limitations.

### A.   Interference Claim

---

[5] Sparenberg also alleges his 2014 negative performance evaluation constituted retaliation.  (*See* ECF No. 8, ¶ 66).  This claim occurred within two years of Sparenberg's filing of the instant complaint and is thus, also not barred by the statute of limitations.

[6] Eagle Alliance argues that Sparenberg was on notice of the elimination of his pay uplift as soon as Eagle Alliance transferred him; thus, Eagle Alliance argues, the statute of limitations began to run when Eagle Alliance transferred Sparenberg.  To prove the point, Eagle Alliance claims Sparenberg admitted that, "he was not entitled to the uplift pay upon his removal from NSOC." (ECF No. 40, p. 10).  This is a mischaracterization of the record—Sparenberg only admits he knew of no other non-NSOC employees who were receiving a pay uplift.  (ECF No. 39, Ex. 3, 141:7–21).  Eagle Alliance's questionable claim is further weakened by Sparenberg's testimony that he emailed Eagle Alliance asking it to reinstate the uplift pay after it was eliminated, showing Sparenberg believed he was still entitled to the pay.  *Id.* at 48:18–50:15.

To prove an interference claim, a plaintiff must show: (1) he was eligible for the FMLA's protections; (2) he gave notice to his employer; (3) the employer interfered with his exercise of FMLA rights; and (4) the employer prejudiced him in the process.[7] *See Bosse v. Baltimore Cnty.*, 692 F. Supp. 2d 574, 584 (D. Md. 2010); *see also* 29 U.S.C. § 2615(a)(1). Interference and prejudice exist where an employer discourages the taking of leave or uses "the taking of FMLA as a negative factor in employment actions, such as hiring, promotions or disciplinary actions . . . ." 29 C.F.R. 825.220 (c). The FMLA further provides that an employee:

> shall be entitled, on return from [FMLA] leave—(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1). In such a situation, an employer can avoid liability if it shows the plaintiff's FMLA leave was not a but-for cause of an adverse employment action. *See Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 547 (4th Cir. 2006).

        i.        Interference

Sparenberg alleges that Eagle Alliance illegally used his FMLA leave in January 2011 and December 2011 as a negative factor in transferring him from NSOC to a Special Projects assignment, where he eventually made less money. I find Sparenberg has presented a genuine issue of material fact.

The record shows Eagle Alliance and its client, NSOC, repeatedly referenced Sparenberg's absences as a motivating factor for the transfer. For example, on December 9, 2011, the Friday before Sparenberg's second FMLA leave was to start, an NSOC employee drafted an email to Eagle Alliance inquiring about a replacement for Sparenberg, noting Sparenberg "is sick quite often or has to take off for his wife's illnesses." (ECF No. 39, Ex. 9, p.

---

[7] The first two requirements (notice and eligibility) are undisputed here.

45).  Given the close temporal proximity between Sparenberg's leave and the NSOC employee's

email, a jury could fairly infer the transfer inquiry came because of Sparenberg's request for

leave.[8]  *See Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 871 (D. Md. 2000)

("Temporal proximity between the employer's adverse employment action and the employee's

exercise of her rights under the FMLA may reasonably support an inference that the action was

taken in violation of the FMLA").

　　　This is hardly the only instance where NSOC and Eagle Alliance referenced Sparenberg's

leave as a reason for transferring him.  In an email between Eagle Alliance employees entitled

"Jim Sparenberg Situation and Some Background," an Eagle Alliance Project Manager stated

Sparenberg "has missed a lot of work with his wife and his health problems."  (ECF No. 39, Ex.

9, p. 42).  Similarly, in an email to Sparenberg's third-level supervisor at Eagle Alliance, an

Eagle Alliance Program Director noted Sparenberg's "absence[s] and spotty reliability have been

an issue at NSOC for quite a while."[9]  *Id.* at 39.  Sparenberg further alleges his Eagle Alliance

supervisor and NSOC supervisor both independently told him that he was being transferred

because he was taking too much time off.  (ECF No. 39, Ex. 1, p. 3; Ex. 3, 40:2–14).  Sparenberg

has proffered sufficient evidence to show that his transfer came, at least partly, because of his

taking of FMLA leave.

　　　Eagle Alliance alleges it was Sparenberg's technical deficiencies—not his taking of

leave—that prompted his transfer; however, Eagle Alliance fails to proffer evidence sufficient to

show the absence of a genuine issue of material fact.  Eagle Alliance points to the

---

[8] While Eagle Alliance argues the email occurred prior to Sparenberg's request for leave, it
provides no evidence for this assertion.  (*See* ECF No. 40, p. 7).  Viewing the inference in the
light most favorable to Sparenberg, a jury could reasonably conclude the email and Sparenberg's
leave were related.

[9] Importantly, Eagle Alliance does not claim non-FMLA absences were a reason for
Sparenberg's transfer.

aforementioned December 9 NSOC email, where, in addition to mentioning his absences, an NSOC employee suggested Sparenberg's technical skills were "not [excellent]."  (ECF No. 39, Ex. 9, p. 45).  However, given the discussion of Sparenberg's technical skills emerges only after the employee mentions Sparenberg's absences, and appears to be secondary to the employee's concerns about Sparenberg's absences, a reasonable jury could still find Eagle Alliance used Sparenberg's absences as the primary reason for his transfer.

Eagle Alliance also avers that a 2008 performance evaluation shows Sparenberg lacked technical proficiency.  The cited evaluation states that Sparenberg "has occasionally missed the objective for the number of completed tickets," and "better dedication to work habits would result in increased productivity."  (ECF No. 36, Ex. B, pp. 91–92).  The evaluation went on to recommend that Sparenberg "more actively seek help for technical problems that he has yet to become adept at resolving."  *Id.* at 92.

This evidence is insufficient to sustain Eagle Alliance's summary judgment motion for several reasons.  First, the evaluation came more than two years before NSOC first inquired into Sparenberg's replacement.  The significant gap in time between the supposedly negative review and his transfer limits the probative value of the evaluation.  Second, read in context, the cited sections track more as constructive criticism than an accusation of technical deficiency.  In the same evaluation, Eagle Alliance rated Sparenberg as "meet[ing]/occasionally exceed[ing] expectations" and said he was a "sound technician" who had "provided strong technical support to one of the most demanding customers on this contract."  *Id.*  Eagle Alliance also graded Sparenberg as consistently exceeding expectations with respect to customer impact.

To prove its case that Sparenberg was technically deficient, Eagle Alliance almost wholly relies on the 2008 review and the December 2011 NSOC email.[10]  But these two slices of evidence are anomalies in the record—indeed, during his time at NSOC, Sparenberg never had a rating below "meets/occasionally exceeds expectations."  (*See* ECF No. 39, Ex. 6, p. 14, No. 19).  In Sparenberg's performance review for 2011, the year before his transfer, Sparenberg's supervisor said, "[Sparenberg] is a very valuable member of the NSOC . . .  Support Team"  and also that Sparenberg's "technical knowledge and customer service skills have directly contributed to the successful efforts that this team has accomplished throughout this past year." (ECF No. 39, Ex. 12, p. 5).  Sparenberg's second-level supervisor at Eagle Alliance even admitted that, based on Sparenberg's 2012 report alone, she would not have removed him from NSOC.  (ECF No. 39, Ex. 7, 101:6–11).  Such evidence runs directly counter to Eagle Alliance's characterization of Sparenberg as a technically deficient employee.

Moreover, the record shows Eagle Alliance was aware that transferring Sparenberg was a potential FMLA issue.  For example, Eagle Alliance's HR department told Eagle Alliance management they could not move Sparenberg from NSOC, presumably due to FMLA concerns. (ECF No. 39, Ex. 9, p. 38).   Sparenberg's third-level supervisor also told a colleague that he was working through Sparenberg's FMLA issues with Eagle Alliance's HR department.  (ECF No. 39, Ex. 9, p. 39).  A reasonable inference could be made that the result of the work-through was the finding of a pretextual reason—technical deficiencies—for Sparenberg's transfer.

---

[10] Eagle Alliance also cites to an EEOC interview with Sparenberg's NSOC supervisor where she stated, "all of the NSOC staff was in agreement that [Sparenberg's] lack of technical skills and his absence had caused a problem for the operations center and their mission."  (ECF No. 36, Ex. B, p. 122).  A post-hoc rationale like this, proffered in a litigation setting, is given a skeptical reading. *See, e.g.*, *E.E.O.C. v. Sears Roebuck & Co*., 243 F.3d 846, 853 (4th Cir. 2001) (holding a factfinder "could infer from the late appearance of [defendant's] current justification" that it was not a legitimate explanation for an employment action).

Accordingly, a jury could fairly find Eagle Alliance transferred Sparenberg not for his alleged technical deficiencies, but instead because of his taking of leave.

Next, Eagle Alliance argues that the real reason it transferred Sparenberg was that NSOC demanded a transfer.  In essence, Eagle Alliance attempts to disclaim liability by pushing blame for Sparenberg's transfer onto its client, NSOC.  Even assuming *arguendo* that NSOC forced Eagle Alliance to transfer Sparenberg, this argument finds no quarter here.  An employer may not immunize its actions by ducking behind the preferences of a client.

Courts have consistently held that, in the employment law context, client or consumer preference cannot cleanse an employer's actions—even when the employer claims to have acted free of bias.  *See, e.g.*, *Hylind v. Xerox Corp.*, 380 F. Supp. 2d 705, 713 (D. Md. 2005) (holding that customer preference is not considered a *bona fide* occupational qualification for Title VII); *Williams v. G4S Secure Solutions (USA), Inc.*, No. 10-3476, 2012 WL 1698282, at *22 (D. Md. May 11, 2012); *see also Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 477 (11th Cir. 1999) (finding a defendant liable under 42 U.S.C. § 1981 for intentionally matching the races of callers and employees when callers requested a racial match); *Smith v. United Parcel Serv., Inc.*, 433 F. App'x 623, 629 (9th Cir. 2011).  For instance, under Title VII (an analogous statute to the FMLA), an employer cannot refuse to hire male employees simply because its customers prefer female ones.  *Diaz v. Pan Am. World Airways*, 442 F.2d 385, 398 (5th Cir. 1971).  This is consistent with the broader employment law principle that the employer has the ultimate responsibility for providing a non-discriminatory working environment—even when third parties are creating discriminatory conditions.  *See, e.g.*, *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422 (4th Cir. 2014) (stating an employer can be held liable for discrimination for third-party actions); *Robinson v. Lorillard*

*Corp.*, 444 F.2d 791, 799 (4th Cir. 1971) (placating a union was not a legitimate justification for a discriminatory practice); *Dunn v. Washington Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005) ("Because liability is direct rather than derivative, it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer.  Ability to 'control' the actor plays no role.").  As the Fifth Circuit notes, it would be "totally anomalous" to allow client or customer preferences to determine which flavors of discrimination are valid.[11]  *Diaz*, 442 F.2d at 389.

Finally, Eagle Alliance argues that because regular attendance is an occupational qualification to work at a mission-critical facility like NSOC, discrimination based on attendance is legally protected.  (*See* ECF No. 40, p. 17).  While this argument may hold intuitive appeal, it finds no basis in the law.  By enacting the FMLA, Congress chose to explicitly prohibit attendance-based discrimination in situations like Sparenberg's.  Indeed, Eagle Alliance can cite no controlling precedent where discrimination based on the taking of FMLA leave is legally permitted simply because the client demands it.[12]  Accordingly, even if Eagle Alliance can show NSOC insisted on Sparenberg's transfer, a reasonable jury could find that its acquiescence renders it liable.

---

[11] While many of the aforementioned cases arise under Title VII, the Fourth Circuit has indicated the analytical framework of Title VII case law applies to cases under the FMLA.  *See Yashenko*, 446 F.3d at 551 (analyzing a FMLA claim under a Title VII burden-shifting framework); *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).

[12] Eagle Alliance cites *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347 (M.D. Fla. 2003), *McQueen v. Wells Fargo Home Mortgage*, 955 F. Supp. 2d 1256 (N.D. Ala. 2013), and *Ranade v. BT Americas, Inc.*, 581 F. App'x 182 (4th Cir. 2014) (per curiam) for its argument.  The cases are unpersuasive.  First, *McQueen* is inapplicable here because in that case, a client demanded removal based on job performance, a valid ground.  The language cited from *Adecco* is dicta—the court there ruled for the defendant on another ground.  Further, the dicta in *Adecco* is unpersuasive because it goes against the weight of authority on the topic.  *Ranade* is inapposite to the present case because when the defendant in *Ranade* removed a plaintiff from an assignment, the plaintiff no longer qualified for FMLA leave and the FMLA's associated protections.

ii.     Prejudice

A reasonable jury could also find Eagle Alliance prejudiced Sparenberg by transferring him and eliminating his pay uplift.[13]   Prejudice exists where a plaintiff can demonstrate a loss of benefits or compensation or the employee is denied "employment, reinstatement, [or] promotion."  *Bosse*, 692 F. Supp. 2d at 585 (internal quotation marks and citations omitted).

Upon return from leave, the FMLA requires an employer to reinstate an employee to "an equivalent position with equivalent employment benefits, pay and other conditions of employment."  29 U.S.C. § 2614(a)(1).  The Department of Labor defines an equivalent position as one "that is virtually identical to the employee's former position in terms of pay, benefits and working conditions . . . . [i]t must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority."  29 C.F.R. § 825.215(a); *cf. Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (holding that liability under Title VII can arise when there is a "reassignment with significantly different responsibilities").  Here, Sparenberg's duties at his Special Projects assignment are different from his duties when he was at NSOC—Sparenberg alleges, and Eagle Alliance does not deny,[14] that his responsibilities have diminished.  Sparenberg no longer performs computer troubleshooting; in Sparenberg's words, he is "just a computer mover" who moves and installs computers.  (ECF No. 39, Ex. 3, 28:5–14).  Accordingly, a reasonable jury could find Sparenberg suffered prejudice because of the change in his job responsibilities.

---

[13] While Sparenberg alleges his overall pay has changed, he admits that his hourly pay has actually increased.  (*See* ECF No. 39, Ex. 3, 115:7–117:6).  The only decrease in pay stems from the elimination of his pay uplift.

[14] Eagle Alliance admits the transfer "has some effect on [Sparenberg's] day to day [*sic*] duties." (ECF No. 36, p. 25).

More importantly, in June 2013, more than a year after Sparenberg's transfer from NSOC to Special Projects, Eagle Alliance eliminated Sparenberg's pay uplift.  (ECF No. 36, Ex. A, p. 2, ¶ 32).  A pay decrease undoubtedly constitutes prejudice.  *See* 29 U.S.C. § 2614(a)(1).  While Eagle Alliance suggests the year-plus time lag between Sparenberg's transfer and the elimination of his pay uplift shows the decrease in pay was not connected to a potential FMLA violation, its own admission proves otherwise.  Eagle Alliance's corporate designee admitted the continuation of pay uplift after Sparenberg left NSOC was a mistake.[15]  A reasonable jury would likely find the decrease in pay and Sparenberg's transfer related and thus, that prejudice existed.

### B.  Retaliation Claim

Unlike an interference claim, which vindicates the FMLA's prescriptive rights, a retaliation claim comes from the FMLA's proscriptive provisions, which protect employees from retaliation for taking FMLA leave.  *Yashenko*, 446 F.3d at 546; 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.").  To make a *prima facie* retaliation case, a plaintiff must show: (1) he was engaged in a protected activity; (2) his employer took an adverse employment action; and (3) the adverse action was causally connected to the plaintiff's protected activity.  *Jordan v. Radiology Imaging Associates*, 577 F. Supp. 2d 771, 786 (D. Md. 2008).

To establish an adverse employment action, a plaintiff must show the employer's actions were "harmful to the point that they could well dissuade a *reasonable* worker from making or

---

[15]     Q: Okay.  So ideally, if the procedure and the process had worked, [Sparenberg's] payment would have stopped as soon as he departed NSOC.

A: Yes.

(ECF No. 39, Ex. 7, 99:2–5).

supporting a charge of discrimination." *Fordyce v. Prince George's Cnty. Maryland*, 43 F. Supp. 3d 537, 548 (D. Md. 2014) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)) (internal quotation marks omitted) (emphasis in original).  Put another way, an adverse employment action must "adversely affect the terms, conditions, or benefits of the plaintiff's employment," which include compensation, job title, job responsibilities, and opportunity for promotion. *Id.*; *Bosse*, 692 F.Supp.2d at 588 (internal citations and quotation marks omitted).

To successfully plead a retaliation claim, a plaintiff must either proffer direct or indirect evidence of retaliation, or prove his case under the *McDonnell Douglas* burden-shifting framework. *See Adams v. Wallenstein*, 814 F. Supp. 2d 516, 524 (D. Md. 2011).  To avoid the *McDonnell Douglas* burden-shifting framework, a plaintiff "must provide *direct* evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Edusei v. Adventist Healthcare, Inc.*, No. 13-0157, 2014 WL 3345051, at *9 (D. Md. July 7, 2014) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001)) (internal quotations marks omitted) (emphasis in original).  A plaintiff must proffer statements that "reflect directly the alleged discriminatory attitude" and those statements must have a nexus with the alleged adverse employment action. *Id.* (quoting *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999)).

I first consider whether Sparenberg presents a viable claim for retaliation concerning his transfer from NSOC and subsequent reduction in pay uplift.  I find Sparenberg has presented a *prima facie* case of retaliation and has adequately proved his case through direct evidence.  First, it is undisputed Sparenberg was entitled to and properly followed the procedures for FMLA leave in January and December 2011.  Second, given there has allegedly been a decrease in Sparenberg's pay and responsibility, an adverse employment action has occurred.  *See, e.g.*,

*Fordyce*, 43 F. Supp.3d at 548 (holding that a plaintiff's job transfer, accompanied by a decrease

in responsibility, and a monetary penalty both constituted adverse employment actions).  Third, a

reasonable jury could find from the direct evidence that Eagle Alliance discriminated against

Sparenberg because of his taking of FMLA leave.  As discussed *supra* in Part I.A, there are

multiple emails from Eagle Alliance and its client NSOC from which a reasonable jury could

find that Eagle Alliance transferred Sparenberg and decreased his pay due to his taking of FMLA

leave.  The subject of absences is brought up repeatedly in connection with Sparenberg's

transfer, establishing both an "alleged discriminatory attitude" toward Sparenberg's taking of

FMLA leave and a nexus between the statements and the adverse employment action.  (*See, e.g.*,

ECF No. 39, Ex. 9, pp. 28–30, 33–34, 37–38, 39).[16]  Accordingly, under the direct evidence

framework, Sparenberg presents a believable retaliation claim in regards to his transfer and

reduction in pay.

 I next consider Sparenberg's claim that Eagle Alliance retaliated against his taking of

FMLA leave by giving him a negative performance review in 2014.  Sparenberg fails to proffer a

*prima facie* case of retaliation because he cannot show Eagle Alliance took an adverse

employment action against him.  To show that a negative performance review is an adverse

---

[16] Given there is direct evidence of a claim for retaliation, the inquiry ends here; however, I also
note that Sparenberg presents a genuine dispute of material fact under the *McDonnell Douglas*
framework.  Under this framework, once a plaintiff meets its initial burden of establishing a
prima facie case of retaliation, the burden shifts to the defendant to show a legitimate, non-
discriminatory reason for its action.  *See generally McDonnell Douglas Corp. v. Green*, 411 U.S.
792 (1973); *see also Adams*, 814 F.Supp.2d at 524.  If the defendant is successful, the burden
returns to the employee to show "the employer's proffered explanation is a pretext for FMLA
retaliation."  *Id.*  As discussed above, Sparenberg meets all elements of a prima facie case.  Eagle
Alliance also carries its burden—it offers Sparenberg's poor technical skills as a legitimate, non-
discriminatory reason for its action.  Lastly, as discussed *supra* in Part I.A.i, by directing this
court to Eagle Alliance's emails discussing his absences, Sparenberg has created a genuine
dispute of material fact regarding whether Eagle Alliance's technical deficiencies reasoning was
pretextual.

employment action, a plaintiff must show "real, rather than speculative, employment injury."

*Lewis v. Forest Pharm., Inc.*, 217 F. Supp. 2d 638, 648 (D. Md. 2002).  Here, Sparenberg fails to

show the negative performance review led to any further consequences—there are no colorable

allegations that, because of the performance review, Sparenberg lost wages, was passed over for

promotion, or lost benefits.  In fact, a little over a half a year later, Eagle Alliance upgraded

Sparenberg's performance rating in an interim evaluation.  (ECF No. 36, ¶ 29); *see Adams v.*

*Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015) (holding that a written

reprimand does not qualify as an adverse employment action when there is no further discipline)*;*

*Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003) (holding that a negative evaluation

that has been removed without any further effect does not constitute an adverse employment

action).  Accordingly, Sparenberg fails to show he suffered an adverse employment action and

his retaliation claim—as it relates to his negative performance review in 2014—is dismissed.

## II.      Title VII and ADEA Claims

In Count III of his complaint, Sparenberg alleges Eagle Alliance illegally used age as a

factor in replacing him at NSOC with a younger counterpart in violation of Title VII and the

ADEA.  I find Sparenberg's claims are barred by the applicable statutes of limitations.

Under Title VII or the ADEA, before a plaintiff can file suit, he must file a charge of

discrimination with the EEOC.  *See* 42 U.S.C. § 2000e-5(f)(1); 29 U.S.C. § 626(d); *see also*

*Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).  There are two possible limitation

periods for filing an EEOC charge: the default period is 180 days after the alleged

discrimination; however, if the charge is filed in a deferral state (where a state law also prohibits

the alleged discriminatory employment decision), a plaintiff has 300 days to file suit with the

state deferral agency.  Here, Maryland's deferral agency has a work-sharing arrangement with

the EEOC that effectively makes a claim filed in front of one agency filed before both.

Accordingly, the parties agree that Sparenberg had 300 days from the date of the last alleged discriminatory action to file an EEOC charge.  (*See* ECF No. 36, p. 10).

In Count I, Sparenberg alleges only two discriminatory acts: (1) his transfer on April 21, 2012; and (2) the elimination of his pay uplift on June 22, 2013.  Both alleged acts occurred more than 300 days before Sparenberg filed his EEOC charge on April 21, 2014.  Thus, Sparenberg's ADEA and Title VII claims are barred by statutes of limitations.

Sparenberg argues his ADEA and Title VII claims should gain the benefit of equitable tolling because he did not know of his claims at the time of the alleged discrimination.  His argument is unavailing.  Equitable tolling is "reserved for those rare instances where–due to circumstances external to the party's own conduct–it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc) (internal quotation marks and citations omitted); *see also Olson v. Mobil Oil Corp.*, 904 F.2d 198, 201 (4th Cir. 1990).  Equitable tolling can be applied where the employer "has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action." *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987).  To make a claim for equitable tolling, Sparenberg must show: "(1) extraordinary circumstances, (2) beyond his control or external to his own conduct, (3) that prevented him from filing on time." *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004) (internal quotation marks and citations omitted).

Here, Sparenberg shows nothing of the sort.  His only argument in support of equitable tolling is his ignorance of Eagle Alliance's age discrimination.  Sparenberg proffers no evidence showing Eagle Alliance or any other external force prevented Sparenberg from pursuing or

discovering an ADEA or Title VII claim.[17]  Accordingly, equitable tolling is inappropriate and Sparenberg's claim is dismissed because it is barred by Title VII's and the ADEA's statutes of limitation.

### III.     ADA Claim

In Count IV of his complaint, Sparenberg alleges that Eagle Alliance violated Title I of the ADA.  Title I of the ADA adopts Title VII's procedural limitations, including Title VII's requirement that, in a deferral state, a charge must be filed with the EEOC within 300 days of the alleged unlawful conduct.  *See* 42 U.S.C. § 12117 (incorporating Title VII procedures into ADA Title I).  As discussed *supra* in Part III, because Sparenberg alleges no discriminatory act after June 22, 2013, the alleged discrimination did not occur within the 300-day period before Sparenberg filed his EEOC complaint.  Accordingly, Sparenberg's ADA claim falls outside the statute of limitations and is dismissed.[18]

### CONCLUSION

For the aforementioned reasons, Eagle Alliance's motion for summary judgment (ECF No. 36) is granted in part and denied in part.  The motion is granted for Sparenberg's claims arising under Title VII, the ADEA, and the ADA (Counts III and IV).  The motion is also granted for Sparenberg's FMLA retaliation claim (Count II) as it pertains to Sparenberg's 2014 performance review.  The motion is denied with respect to all other FMLA claims in Counts I and II.  A separate order follows.

---

[17] Indeed, Sparenberg does not present any evidence at all showing age was a motivating factor for his transfer.  Even if his claim was within the statutes of limitation, he presents no triable issue of fact.  His claim would also be dismissed on this ground.

[18] Sparenberg argues that his ADA claim requires elaborate knowledge of the relevant statute and thus, equitable tolling should apply.  This argument is unavailing—ignorance of the law is insufficient to trigger equitable tolling.  *See, e.g.*, *Brown v. McKesson Bioservices Corp.*, No. 05-0730, 2006 WL 616021, at *8 (D. Md. Mar. 10, 2006) (holding that a plaintiff's excusable neglect does not trigger equitable tolling).

| __10/15/2015__ | | __/s/__ |
|---|---|---|
| Date | | J. Frederick Motz |
| | | United States District Judge |